Plaintiff, Louis J. Mathieu, conducts in the City of Shreveport, Louisiana, an insurance business under the title of "Shreveport Insurance Agency." Defendant, Herrin Transportation Company, Inc., is domiciled in the City of Houston, Texas, but is authorized to do and is doing business in the State of Louisiana. It operates a fleet of trucks, vans, etc., in the transportation of various kinds of goods, wares and merchandise throughout the country.
During the years 1935-1939, inclusive, plaintiff, as agent for several insurance companies, effected various kinds of insurance in defendant's behalf, indispensable to the lawful conduct of its business and delivered to it contracts or policies issued by said companies covering such insurance. Plaintiff paid all premiums due under said policies and charged the same to defendant. A running open account between them continued during said years, the total debits of which aggregated $56,562.96, with credits amounting to $55,292.75. This suit was instituted to recover the difference between debits and credits or $1,270.21, with interest.
Defendant, in answer, admits that he owes plaintiff the sum of $170.40 on the account and tendered same, but denies liability for and challenges the correctness of the account to the extent of the difference of $1,099.81, made up of debit charges of *Page 754 
$933.01 and $8.67, plus six separate items of varied amounts aggregating $158.13, for which credit is claimed. However, defendant's counsel, out of a spirit of fairness and frankness, in their brief, state that only the item of $933.01 and an alleged credit due of $54.86, are now in controversy. They concede the correctness of the account save as to these. They are described, and defendant's defense thereto set out, in the answer, as follows:
"Under date of March 26, 1936 plaintiff absolutely without authority charged to the defendant premiums in the sum of $933.01. Defendant promptly repudiated said charge, does not owe it, and has always refused to pay the same.
"On March 25, 1937, there was deducted from certain freight bills, covering overcharges, the sum of $54.86. This deduction was never credited by the plaintiff to defendant. * * *".
As to the item of $933.01, which really is the meat of the suit, in the alternative, defendant pleads in bar thereof liberative prescription of three years. The plea was not specifically ruled upon. It is not urged here and, presumably, has been abandoned. We shall so treat it.
Defendant appealed from judgment in favor of plaintiff for the amount for which sued.
Whether defendant owes the $933.01 is a question of fact. This debit is made up of two items charged as additional premiums under policy No. AT 393270 issued by the Commercial Standard Insurance Company of Ft. Worth; one being for $591.35 on public liability insurance account, and the other $341.70 on property liability insurance account. Defendant stoutly denies that the charge is a proper one and that it ever agreed to pay the same. On the other hand, plaintiff is as equally positive that defendant in a conference at Ft. Worth, Texas, on May 10, 1936, in the insurer's office, did agree to pay additional public liability and property damage premiums, because of excess losses, in order to prevent cancellation of the policy, the amount thereof to be determined in keeping with tables of the Texas Experience Rating Plan; and that said amount of additional premiums is in keeping with said tables. The policy involved issued January 26, 1936. The additional premiums charged according to plaintiff's contention, became effective May 26th thereafter.
On May 7, 1936, R.C. Stewart, the insurer's assistant secretary at Houston, wrote plaintiff a letter in which attention was specifically directed to the losses experienced under the policy for the less than five months of its term, and also on like policy for the twelve months period ending January 26, 1936. For said twelve months period the loss paid by the insurer (16 claims) exceeded the premium by nearly $1,000, and for the near five months period eleven claims had been paid which in amount exceeded a proportionate amount of premium for said period of over $300. In other words, the loss rate for said periods materially exceeded the amount of premiums, and, for this reason, the risk was characterized as being undesirable and, of course, unprofitable.
It was also stated in said letter that the insurer had been unable to secure any cooperation from defendant's management toward accident prevention, although receiving promises to do so. The letter concludes as follows:
"Inasmuch as we have taken a great loss on this risk and inasmuch as the accident frequency is increasing and since we do not have the cooperation of the assured it is our desire to retire from the risk. We ask that you please replace this risk with some other company immediately and advise us the effective date of such policy and we will prepare insurance waivers to be filed with the Railroad Commission relieving us of liability the effective date of the other company's policy.
"We regret very much that it is necessary that we ask for the cancellation of this policy, but we believe that you will agree with us that it should be cancelled."
On receipt of this letter, plaintiff called on the `phone at Houston Mr. R.T. Herrin, defendant's president, and imparted to him the substance of its contents. At plaintiff's suggestion, the two men met at Dallas, Texas, the following morning and then drove over to Ft. Worth to discuss the matter with Mr. Stewart. Plaintiff and Mr. Stewart both testified that Mr. Herrin was very much agitated over the threat to cancel the policy and that plaintiff did his utmost to prevent this being done, believing, as the agent of both parties, he would be doing a good service in so acting. Mr. Stewart was strongly inclined to go forward with his prior decision to cancel the policy. The situation was discussed at length between the parties. However, he *Page 755 
abandoned the determination and the conference ended with the understanding that the policy would not then be canceled. Exactly what was agreed upon or understood between the parties to be done in order to maintain the policy in force, is a matter of sharp dispute between Herrin on one side and Stewart and plaintiff on the other. On the subject, Mr. Stewart testified as follows:
"A. Mr. Herrin didn't want his insurance policies canceled he so stated when they came in the office and we set out to work out a plan whereby we could continue the risk, whereby it would be fair to Mr. Herrin and to the company; so we agreed in that meeting that we would apply to the risk the Texas Experience Rating Plan on whatever additional premiums of Mr. Herrin until the expiration date of that particular policy.
"Q. What is the Texas Experience Rating Plan? A. Well, that would be very difficult to explain; it is a long formula which has been worked out by the insurance companies of Texas and they take the losses of premiums for a certain period of time and apply this formula to it; it is a formula of long standing, used for years and years.
"Q. State whether or not Mr. Herrin agreed in consideration of your company not cancelling the policies to accept the premiums for the term the policy was going to run on the basis of the Texas Experience Rating Plan. A. He did."
In this testimony he is corroborated in detail by plaintiff.
Mr. Herrin testified positively that nothing whatever was discussed at the conference other than accident prevention. He is equally positive that neither then nor at any time since did he agree to pay additional premiums based upon tables of the Texas Experience Rating Plan, and that he never knew anything about the charge of $933.01, until defendant's insurance business had been taken from plaintiff, which was in the latter part of the year of 1939.
We feel certain that accident prevention and a means to attain it, for defendant's future benefit, were discussed by the parties, but we are equally certain the avowed intention to cancel the policy for the reasons assigned in Stewart's letter to plaintiff, above referred to, would not have been abandoned simply upon the agreement on Mr. Herrin's part to take more interest in approved methods of instruction of drivers designed to prevent or reduce accidents. Defendant's agents and officers had not been previously cooperative in this respect.
The testimonial proof clearly preponderates against defendant. Even though it should be assumed, a position we are not warranted in taking, that plaintiff would be disposed to color his testimony in his own interest, there appears no good reason for discounting the weight of Mr. Stewart's testimony or concluding that he wilfully or unintentionally misrepresented the facts of which he had personal knowledge. So far as the record discloses he has nothing at stake and has no pecuniary interest in the outcome of the suit. Plaintiff, long ago, paid his company the amount of additional premiums.
In addition to the superior weight of the testimony being in favor of plaintiff, we think the written evidence strongly at variance with defendant's position. In the first place, Mr. Herrin is obviously in error when he testified that he knew nothing of this charge of $933.01 until his company's business was taken from plaintiff in 1939, as we shall hereinafter demonstrate.
On May 6, 1936, a few days after the Ft. Worth conference, the insurance company wrote plaintiff a two-page letter about the insurance coverage being carried for defendant, from which we quote the following:
"Since Mr. Mathieu and Mr. Robert Herrin were in our office, we have given serious consideration to the above named risk. At first we thought we would go ahead with the cancellation of the policy, but due to Mr. Herrin's willingness and cooperative attitude towards accident prevention, we have worked out a plan whereby we are agreeable to going along on the risk for the time being and trying to make it a better risk.
"In fairness to the assured and also in fairness to the Company we are placing this risk on the Texas Experience Rating plan and making the experience rate effective May 26th and for the experience debit we have used the experience developed during the fifteen months that we have been on the risk. We arrive at a public liability debit of 21.4% and property damage debit of 26.1% and we have figured the additional premium on the prorata basis as of May 26th. We are enclosing herewith endorsement to be delivered to the assured. *Page 756 
We will apply this experience rating to the assured's risk so long as it is carried by the Commercial Standard, and if it should develop a credit, of course the assured will be given the benefit of the credit, the experience rating to be refigured at the expiration date of each policy. We know of no better plan in which to handle this risk.
"In addition to putting the policy on the experience rating plan, we will have our accident prevention supervisor to set up a safety organization for the assured and work with the assured on safety and accident prevention. The Company is sold on Mr. Herrin's cooperative attitude towards safety and accident prevention, and we believe that with the personal supervision of this safety organization in a short while he will reduce this debit to a credit.
"We ask that you please take this matter up with Mr. Robert Herrin immediately and let us have his reaction before the effective date of the endorsement charging the additional premium, inasmuch as the Company does not want to continue on the risk on the present basis.
"If Mr. Herrin is agreeable to going along with us on the basis outlined above, we want to immediately put a man on the risk and set up a safety organization equal to none."
The endorsement referred to, reads as follows:
"In consideration of an additional premium of $933.01, public liability $591.31 — property damage $341.70, it is hereby understood and agreed that an experience debit of 21.4% applies to the public liability and 26.1% debit applies to the property damage premiums.
"This endorsement shall take effect on the 26th day of May, 1936, at Noon, and shall terminate with this policy.
"Subject to all the conditions, limitations and agreements of the policy as written, except as herein specifically provided.
"Attached to and forming a part of Policy No. AT 393270 of the Commercial Standard Insurance Company.
"Dated at Shreveport, La. this 26th day of May, 1936.
"Shreveport Insurance Agency "By ________________________ "Agent"
On May 21st plaintiff wrote defendant in regard to the insurance and enclosed a copy of the above mentioned letter. Therein he said:
"You will note from the contents of their letter that they are willing to continue on your risk provided they obtain the experience debit which I understand has been complied (sic) by the Texas Board. I understand that this experience would be charged by all companies and was arrived at by complying (sic) your losses against your earned premium.
"It is needless for me to say that your loss ratio has been very bad. * * *"
"* * * * you will note from the Company's letter that they are willing to reduce this debit experience at the end of the policy period if same justifies it. In other words, they do not want to hold you up but at the same time they do not want to continue to lose on your risk.
"I can, from time to time, help to reduce these rates, thereby saving you something on the premium, that part I will look after. I will be able to reduce your Louisiana compensation rates approximately 15% at renewal.
"I would like for you to give considerable consideration to the contents of this letter and understand that if we work together it is quite possible that we can improve the experience on all of your insurance risks and consequently be in a position to secure reductions in rates. * * *"
Plaintiff testified that the copy of endorsement to which referred in the insurer's letter to him, intended to be affixed to the policy, was enclosed with his letter to defendant; also, a bill for the amount of additional insurance. Mr. Herrin denies that the endorsement was ever received by his company.
Of all of the persons in defendant's employ, its bookkeeper who had intimate knowledge of letters, statements, etc., received by it, should have known of the receipt of the endorsement and accompanying bill. However, as a witness, she did not corroborate Mr. Herrin's denial of receipt of the endorsement; in fact, she was not interrogated on the subject.
The bookkeeper admitted that statements, including this debit item, were received from defendant; that the amount thereof was regularly carried in "Bills Payable" account and was included in defendant's income tax returns, although she says Mr. Herrin never did okeh it. *Page 757 
In addition to all this, broken down statements of account of the years 1936, 1937 and 1938, at defendant's request, were mailed to and received by defendant. These specifically disclosed the charge of $933.01, to none of which statements did defendant make objection until this suit was filed. He did, however, in reply letter to plaintiff on May 26, 1936, say:
"I have your letter of May 21 with reference to raising our rate on P.L. P.D. and was somewhat surprised to learn that the Commercial Standard would try to increase this rate, effective May 26.
"They talk about debits and credits and experience rating but I am at a loss to understand where they would get such an experience as they mention. I suggest that any increase in rates be postponed until such time as I have had an opportunity to go over our experience rate with them."
The record does not disclose, but on the contrary, negatives that Mr. Herrin or anyone else for his company followed up the suggestion made in this letter; in fact, he admits that the matter was not thereafter discussed. He, acting for his company, allowed this business item to drift for over three years without further question or objection, although having every reason to know that the policy's continued effectiveness depended upon payment of the additional premium of obligation on defendant's part to pay the same. He also knew that plaintiff had regularly paid premiums to the insurer for his company and had carried same on open account. He had no reason to think plaintiff would not have to pay this additional premium if his own company failed to do so.
Another circumstance corroborative of plaintiff's contention lies in the fact that during the year 1936, subsequent to the Ft. Worth conference, additional equipment was acquired by defendant and by appropriate endorsement included in the coverage of the policy on which the premium was determined from the tables of the Texas Experience Rating Plan, the same, proportionately, as had been charged (including increase) for insurance on equipment included within the coverage of the original policy. Defendant paid this latter increase in premium without protest or objection.
And, again, it is not without some probative worth that plaintiff, time after time, over a period in excess of three years, in letters gave defendant the amount of balance due by it on account, which included the $933.01, with the request that he pay the same, and that no protest or criticism against the correctness of the balances shown thereby was made by Mr. Herrin or anyone else representing his company. It is also of some significance that more than once at defendant's request, plaintiff furnished it with detail information concerning the debits making up said balances and at no time was there objection registered to the correctness of such debit charges.
Other instances, like or similar to those above mentioned, unfavorable to defendant, could be named. It would serve no good purpose nor promote the interest of anyone to do so.
Regarding the alleged credit of $54.86, the record is not clear. So many transactions between the parties like this one or similar thereto, occurred over a period of more than four years, naturally their memories touching the facts became hazy. It devolved upon defendant to establish by preponderance of testimony that the account was incorrect to the extent that credit had not been given for this item. We do not think it did so. The prima facie correctness of the account was established.
It is probable this particular item falls within the admitted status of those other items of alleged credit which were abandoned, to-wit: A proper charge against the insurance company but not against defendant, its agent.
Being of the opinion that the trial judge correctly decided the case, the judgment appealed from is hereby affirmed with costs. *Page 758